**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 220042-U

Order filed May 25, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* R.J., | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| a Minor | ) | La Salle County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-22-0042 |
| | ) | Circuit No. 17-JA-21 |
| v. | ) | |
| | ) | |
| G.J., | ) | |
| | ) | Honorable H. Chris Ryan Jr., |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Holdridge and Lytton concurred in the judgment.

**ORDER**

¶ 1      *Held*:   The evidence supported the trial court's finding that respondent was unfit and that terminating respondent's parental rights was in the best interest of her child.

¶ 2      Respondent, G.J., appeals from orders finding her unfit and terminating her parental rights. She challenges the trial court's finding that she was an unfit parent as well as its decision to terminate her parental rights. We affirm.

¶ 3                              I. BACKGROUND

¶ 4          On October 11, 2017, the State filed a petition for adjudication of wardship. The petition alleged that respondent neglected her minor son, R.J. (born July 27, 2016). Specifically, the petition alleged that on October 8, 2017, R.J. was found unresponsive and treated in the emergency room for ingestion of amphetamines while in respondent's care. Respondent admitted to taking Adderall, made suicidal statements, and was involuntarily admitted to a behavioral unit at St. Elizabeth's Hospital.

¶ 5          On November 15, 2017, the trial court entered an adjudicatory order finding the minor neglected due to an injurious environment. The court also entered a dispositional order finding respondent unfit. The dispositional order required respondent to cooperate with the Department of Children and Family Services (DCFS), comply with the terms of the service plan, and obtain a mental health assessment and cooperate with services.

¶ 6          On February 21, 2018, the court entered a permanency order, finding respondent had failed to make reasonable and substantial progress toward returning R.J. home. The order also required respondent to complete a psychological evaluation and parent capacity.

¶ 7          On October 15, 2018, Kim Wirth, a caseworker at the Youth Services Bureau, filed a report. The report included respondent's psychological evaluation and parenting capacity assessment completed by Dr. Nicholas O'Riordan. The evaluation provided the following information. O'Riordan described respondent as focused on ideas not grounded in reality. Respondent obsessed over R.J.'s medical conditions and insisted on the presence of medical problems without medical support. O'Riordan diagnosed respondent with schizoaffective disorder, bipolar type, borderline personality disorder, and factitious disorder imposed on another. He recommended respondent complete an evaluation with a psychiatrist and participate in regular therapy with a psychotherapist

to address her history of delusions, hallucinations, and paranoid thinking. He also recommended outpatient substance abuse treatment.

¶ 8        On December 2, 2020, the State filed a motion to terminate respondent's parental rights. The petition alleged three grounds to terminate respondent's parental rights: (1) respondent failed to maintain a reasonable degree of interest, concern, or responsibility for R.J.'s welfare; (2) respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of R.J.; and (3) respondent failed to make reasonable progress toward the return of her son.

¶ 9        On April 23, 2021, the caseworker, Wirth, filed another report. The report provided the following information. Respondent completed a psychiatry evaluation on July 24, 2020, with Dr. Joshua Straus. Straus diagnosed respondent with episodic mood disorder, attention-deficit hyperactivity disorder, executive function deficit, anxiety, Mas Cell Disorder, and cannabis use disorder, mild, abuse. Respondent made minimal progress in counseling services. Straus referred respondent to Dr. Dawn Epstein for psychotherapist services. Respondent attended four appointments with Epstein to treat her for chronic pain, depression, and anxiety. Respondent did not make any future appointments with Epstein. Respondent also enrolled in counseling at North Central Behavioral Health. She made minimal progress in services. Respondent failed to successfully complete therapy after she verbally abused her counselor. She refused to sign a release of information for Wirth to obtain respondent's discharge summary. On April 8, 2021, respondent was admitted into Evanston Hospital for psychiatric treatment. She remained in the hospital until April 14, 2021. Wirth reported that respondent continued to resist cooperating with the service plan. Respondent failed to reengage in outpatient substance abuse treatment with a mental health component. She also failed to engage in regular psychotherapy.

¶ 10 According to Wirth's report, respondent called the police on January 21, 2021, and reported that R.J. was sexually abused in his foster home. Respondent also contacted the Department of Professional Financial Regulations and reported that R.J. was being sexually abused, that his daycare was not complying with COVID-19 policy, and that her son was at risk due to a heart condition. Additionally, respondent contacted the sheriff's office demanding a welfare check on R.J. because she observed bruises on him. Respondent also contacted DCFS to report that R.J. needed heart surgery, that his foster parents refused to provide him with medical care, that R.J. was sexually abused, and that R.J. was physically abused by a boy at daycare. Respondent was charged with misdemeanor battery against a coworker.

¶ 11 Wirth's report also noted that R.J. had been placed in his foster home since January 17, 2018. R.J. adjusted and thrived in the new environment. R.J. received occupational and developmental services. He had an individualized education program through his school district and qualified for speech services. He visited a cardiologist, who determined that R.J. had muscle bundles in the right ventricle that needed to be repaired in the future.

¶ 12 On August 18, 2021, the cause proceeded to a hearing on the motion to terminate respondent's parental rights. Dr. O'Riordan testified. He performed two psychological evaluations of respondent in July 2018. He diagnosed her with schizoaffective disorder. Respondent showed signs of depression and paranoid delusions. He believed that alcohol was a complicating factor, though respondent denied abusing alcohol. However, her history indicated an extensive use of alcohol and other drugs. He also diagnosed respondent with borderline personality disorder and factitious disorder imposed on another. Respondent's diagnosis made it difficult for her to make appropriate decisions regarding her and R.J.'s welfare.

¶ 13        O'Riordan also performed a parenting capacity evaluation. Respondent could interact with her son. However, respondent focused on R.J.'s medical problems and would not pay attention to R.J. O'Riordan did not believe respondent could effectively parent R.J. at the time. He did believe that respondent could parent R.J. with intense treatment to resolve her mental health and substance abuse problems. However, respondent was not willing to perform certain tasks. Respondent was willing to attend alcoholics anonymous but made excuses for not participating in mental health treatment. He recommended that respondent regularly see a therapist, psychiatrist, and participate in substance abuse treatment.

¶ 14        Wirth testified next. She became the caseworker on September 13, 2018. Wirth provided respondent with the service plan on November 18, 2018, and explained the plan to respondent. The service plan included mental health, substance abuse, housing, employment, psychological evaluation, parenting capacity, and cooperation requirements. The services remained the same until April of 2019, when the recommendations from Dr. O'Riordan's psychological evaluation and parenting capacity assessment were incorporated into the service plan.

¶ 15        Wirth rated respondent unsatisfactory as to employment. Respondent worked at Mennie's Machinery from September 18 until November 2018, leaving due to a foot problem. Respondent told Wirth she worked from home as a massage therapist from March until June 2019. Respondent did not provide any proof of employment or income as a massage therapist. Respondent was unemployed from June 2019 to October 2019. In November 2019, she lived and cared for a man with Parkinson's disease. She did not receive any payment, but he allowed her to live in his home while she cared for him. From December 2019 until February 2020, respondent was unemployed. Respondent began working at the Lamp Liter in Ottawa, Illinois, in February 2020, but left the job when she was arrested for battery. She next worked for Little Caesar's Pizza in July 2020 but left

that job after a month because she attacked a coworker. Respondent then worked at a Comfort Inn for about a month. Wirth believed that respondent had been unemployed since August 2020. On July 19, 2021, Wirth asked respondent about her employment, but respondent refused to answer Wirth's questions.

¶ 16    As to housing, Wirth rated respondent as unsatisfactory. Respondent lived in a rental home in Mark, Illinois, from September 2018 until September 2019, when she was evicted for failing to pay rent. She then lived with a friend, but respondent did not tell Wirth her friend's name or where she lived. A few months later, respondent began caring for and living with an individual with Parkinson's disease. Wirth did not believe that home was appropriate for R.J. to reside. In January 2020, respondent lived with a family friend for about 10 months. That residence would have been appropriate for R.J., but respondent left the home. In October of 2020, respondent moved in with another friend. That home was not appropriate for R.J. In March 2021, respondent lived at a shelter named Naomi's House in Chicago. In April 2021, respondent was admitted into a psychiatric hospital. She then lived at a shelter in Peru, Illinois. The shelter closed and respondent was referred to a shelter in Peoria. Wirth did not know if respondent ever went to that shelter. In June and July of 2021, Wirth asked respondent where she lived, but respondent refused to answer her questions.

¶ 17    Wirth rated respondent unsatisfactory as to drug screens. Respondent was prohibited from using cannabis because it could not be determined if she used it recreationally or abused it. Additionally, respondent's psychiatrist believed that marijuana use would worsen her mental condition. Respondent tested positive for marijuana three times. She tested negative once. She failed to appear for requested drug drops 11 times.

¶ 18    Wirth rated respondent unsatisfactory as to the substance abuse treatment component of the service plan. On December 2, 2017, respondent completed a substance abuse evaluation, but

was unsuccessfully discharged from treatment for refusing treatment. She received a second assessment on July 17, 2018, and completed the recommended individual and group substance abuse counseling in November 2019. After receiving the psychological evaluation and parenting capacity assessment, respondent was recommended to reengage complete substance abuse treatment with a mental health component. Respondent refused to cooperate with the program.

¶ 19     Wirth rated respondent unsatisfactory as to the mental health component of the service plan. Respondent refused an assessment on December 2, 2017. Respondent indicated that she went to Choices Outpatient Clinic in Ottawa, Illinois, for mental health treatment, but refused to sign a release. Respondent refused another mental health assessment in July 2018. In June 2019, respondent reported that she attended counseling at Choices, but respondent refused to tell Wirth who she was seeing. Her attorney provided Wirth with a letter from Choices showing that respondent received services, but respondent continued to refuse to sign a release of information. Respondent informed Wirth that she only saw a psychiatrist for her seizure disorder. In February 2020, respondent signed a release of information from North Shore Counseling in Chicago where she saw Dr. Dawn Epstein. She saw Epstein for pain management counseling. In September 2020, respondent informed Wirth that she received counseling from North Central Behavioral Health. Respondent did sign a release of information for this treatment. In January 2021, Wirth learned that respondent may not qualify for services from North Central due to respondent's extensive mental health issues. In March 2021, respondent stopped receiving services from North Central because she became emotionally abusive toward the therapist. Respondent refused to sign a release for a discharge summary. Respondent entered inpatient psychiatric treatment from April 8, 2021, to April 14, 2021. Wirth did not know if respondent successfully completed treatment because respondent refused to sign a release of information.

¶ 20    Wirth described visitation between respondent and R.J. as stressful and challenging. Two supervisors needed to be present during her visits. Respondent would usually be more concerned about whether R.J. was being bullied at school, or if he was being abused rather than engaging with him. During one visit, respondent called an ambulance because she claimed R.J. had brain damage. R.J. did not have brain damage. A visit on July 19, 2021, ended 5 to 10 minutes early because respondent failed to comply with the mask rules, and she refused to stop video recording when asked. Respondent called the police and accused the caseworkers of kidnapping R.J. One of the supervisors went to get a car to drive R.J. back to daycare. Respondent told police that the supervisor left R.J. in the vehicle alone. However, R.J. was still inside the building being supervised by another caseworker.

¶ 21    On January 21, 2021, respondent contacted the Department of Professional Financial Regulations. She accused R.J.'s daycare of failing to comply with COVID-19 protocols. The department transferred her to the Illinois State Police and respondent alleged that R.J. was being sexually abused in his foster home. The sheriff performed a home check and found respondent's allegations unfounded.

¶ 22    In April 2020, respondent contacted the La Salle County Sheriff four times in one day about performing a wellness check at R.J.'s daycare. She stated that R.J.'s body was covered in bruises, and she believed he was being sexually abused. The sheriff's office contacted DCFS and Wirth. Since it was a Saturday, there was no daycare and there was no further investigation.

¶ 23    On January 12, 2020, respondent met with R.J.'s cardiologist and attempted to convince him to take protective custody of R.J. She, again, claimed that he was being abused in the foster home.

¶ 24　　　　On May 25, 2021, respondent called the sheriff and demanded a welfare check because she believed R.J. was being abused in the foster home. Officers checked on R.J. and found him happy, healthy, and with no signs of abuse.

¶ 25　　　　On cross-examination, Wirth testified that respondent completed a substance abuse assessment at North Central in 2018 and successfully discharged from treatment. However, respondent was asked to immediately reengage in service with a mental health component by Dr. O'Riordan. Respondent failed to reengage in those services. Respondent did complete some parenting courses. Other than a certificate, Wirth did not have any other documentation regarding those classes. Wirth also received a letter from Roger Helgren from OSF HealthCare on October 24, 2019, stating that respondent was receiving psychotherapy and medication management for health issues. However, Wirth did not believe this was a sign of progress as she did not know what progress respondent was making. Finally, Wirth acknowledged that respondent eventually signed all medical release documents on July 22, 2020.

¶ 26　　　　The hearing on the State's motion to terminate respondent's parental rights was continued and recommenced on September 1, 2021. Respondent discharged her counsel and proceeded *pro se* for the hearing. Respondent testified on her own behalf. According to respondent, Wirth told her that she had completed all the service plan requirements. Wirth only told her additional services were needed right before the State filed the petition to terminate parental rights. Respondent acknowledged receiving the service plans and that the plans explained the requirements. Respondent believed each plan indicated that she successfully completed all the goals.

¶ 27　　　　Following arguments, the court found that the State met its burden of proving that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for R.J.'s

welfare, failed to make reasonable progress, and failed to make reasonable efforts. The court found respondent unfit.

¶ 28     On January 19, 2022, the cause proceeded to a best interest hearing. The court appointed respondent an attorney for the hearing. Wirth testified that R.J. had been placed in a traditional foster home. R.J. lived in the home for four years. R.J. was five years old at the time of the hearing. The foster parents lived together in a single-dwelling home in a safe neighborhood. R.J. had his own room. The foster parents provided R.J. with toys. Wirth described the environment as happy and positive. They played board games together, camped outside the home, and read together as a family. They prepared meals together and ate breakfast and dinner as a family. The foster parents nurtured R.J.'s well-being.

¶ 29     R.J. developed a strong bond with his foster parents. R.J. referred to his foster parents as his mom and dad. R.J. was well-adjusted and happy in his foster home. He celebrated holidays with his foster parents. He also celebrated birthdays with his extended foster family and friends. R.J. played T-ball at the park district and wanted to play soccer in the spring. R.J. did well in school and met all the milestones set in his kindergarten class. R.J. had good manners and had positive relationships with his peers in class. R.J. attended speech therapy at school and participated in an after-school program focused on homework and playtime. After school, R.J. went to daycare because both foster parents worked. The foster mother worked from 9 a.m. to 5 p.m. and the father usually came home from work at 4 or 4:30 p.m. The foster parents would stay home from work or relied on extended family to care for R.J. if school and daycare were both closed. R.J. had a heart issue related to muscle bundles surrounding his heart. The foster parents took R.J. to a doctor and were involved with his treatment plan. The foster parents were not

affiliated with a church or religion and did not attend church regularly. Both foster parents signed a permanency commitment and were willing to adopt R.J.

¶ 30    According to Wirth, respondent did have employment and suitable housing at times during the proceedings. Respondent did complete some mental health and substance abuse treatment. Respondent also consistently conveyed her interest in visiting with R.J. Respondent also conveyed her preference to care for her son. Wirth did not believe it was in R.J.'s best interest to remove him from his foster home. R.J. had an attachment and bond to his foster parents and their extended family.

¶ 31    Respondent testified on her own behalf. She had been living in her own apartment for the past four months. However, she had been unemployed for the last two months. She lost her last job due to the COVID-19 pandemic. She had difficulty finding a new job due to the pandemic. Respondent was "not accepted for unemployment." Respondent last saw R.J. in July 2021. She asked for more visits but claimed that Wirth never responded to her calls. Respondent attended church, and had R.J. baptized. Respondent wanted to raise R.J. in a religious household. Respondent believed she had a strong bond with R.J. Respondent completed 25 parenting courses online and she engaged in mental health services in Ottawa, Illinois, but Wirth would not speak with her counselor. Respondent had difficulty completing in-person mental health services due to the COVID-19 pandemic. She did not know if the pandemic affected her ability to complete drug and alcohol classes because she did not have the opportunity to set up those services. Respondent believed having R.J. in her care was in his best interest.

¶ 32    Following arguments, the trial court found that it was in the best interest of R.J. to terminate respondent's parental rights.

¶ 33    Respondent appeals.

¶ 35        On appeal, respondent challenges the trial court's fitness finding as well as its decision to terminate her parental rights. First, respondent contends the State failed to meet its burden in proving her parental unfitness. The State must prove parental unfitness by clear and convincing evidence, and the trial court's findings must be given great deference because of its superior opportunity to observe the witnesses and evaluate their credibility. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004). We will not reverse a trial court's finding of parental unfitness unless it was contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 36        In its petition, the State argued that respondent was unfit based on her failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare.[1] A parent may be found unfit for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2020). In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a minor's welfare, a court considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Completion of service plans may also be considered evidence of a parent's interest, concern, or responsibility. *Id.* at 1065; *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000). The court must focus on the parent's efforts, not their success. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). In this

---

[1]The State also alleged respondent was unfit for failing to make reasonable progress and efforts toward the goal of reunification. Although respondent challenges these on appeal, we need not address respondent's argument on these issues. A finding that any one allegation has been proven by clear and convincing evidence is sufficient to sustain a parental unfitness finding on review. *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001).

regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred. *Id.* at 278. Accordingly, circumstances such as difficulty in obtaining transportation, poverty, actions, and statements of others that hinder visitation, and the need to resolve other life issues are relevant. *Id.* at 278-79. A parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). Rather, the interest, concern, or responsibility must be objectively reasonable. *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 37        Upon review, we find the trial court correctly found that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for R.J.'s welfare. The service plan prohibited respondent from using marijuana and required respondent to submit to regular drug testing. Respondent made no effort to comply with this requirement. She failed to appear for the majority of the tests, and all but one of the tests she did take tested positive for marijuana. The service plan required respondent to complete a substance abuse assessment and follow up on further treatment. She did complete the assessment and completed individual and group counseling in November 2019. However, Dr. O'Riordan recommended that respondent complete substance abuse treatment with a mental health component. Respondent never reengaged in treatment. Although respondent made some efforts to address her mental health, her efforts fell well below the requirements of her service plan. Respondent received counseling for a seizure disorder in June 2019. She also received counseling services from North Central Behavioral Health. However, she was unsuccessfully discharged from treatment after she verbally abused her therapist. Respondent also began to see Dr. Straus, but never successfully completed treatment. Straus indicated that respondent made no future appointments. Respondent also made no effort to comply with the service plan requirement that she cooperate with the agency. Respondent refused to answer Wirth's

- 13 -

questions and refused to initially sign medial information release documents. Although respondent claimed that the COVID-19 pandemic affected her ability to pursue employment and mental health treatment, she made no effort to work with Wirth to achieve these goals. As to employment, respondent bounced between jobs throughout the proceedings. Similarly, respondent's housing situation was sporadic and several of the homes were inappropriate for R.J.

¶ 38    As to her interactions with R.J., respondent did engage in visits with R.J. However, respondent appeared more concerned with her unsupported belief that R.J. was being bullied at school or being abused rather than actually engaging with her child. One visit ended early because respondent refused to stop video recording and refused to comply with mask rules. Respondent then called the police and claimed the agency kidnapped R.J. Not only this, but respondent also actively engaged in behavior that disrupted R.J.'s wellbeing. She made several false claims to police that R.J. was being sexually abused. She falsely reported that R.J. was abused at daycare. She also called the sheriff for a welfare check based on her false claim of abuse in the foster home. Based on the totality of the circumstances, respondent failed to maintain a reasonable degree of interest, responsibility, or concern in R.J.'s welfare. Therefore, the trial court did not err when it found her unfit.

¶ 39    Next, respondent contends the trial court erred when it found that the best interests of R.J. were furthered by terminating her parental rights. A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 40    At the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of a minor. *Id.* at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). Section 1-3(4.05) of the Juvenile Court Act of 1987 sets forth various factors for the trial court to consider in assessing a minor's best interests. These considerations include: (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 41    We find the statutory factors favor a finding that terminating respondent's parental rights furthered the minor's best interest. R.J has been in foster care since 2017. He has been in the same foster home for four years. Both foster parents were employed and provided a stable living environment for R.J. to thrive. The foster parents expressed their desire to adopt R.J. The foster parents provided for the physical safety and welfare of R.J., including food, shelter, clothing, and healthcare. R.J. was happy and well-adjusted in his foster home and had developed a strong bond with his foster parents. R.J. was too young to provide any guidance on his desires, but his need for permanency is fulfilled by his foster parents. R.J. attended school, had friends, received speech therapy, went to his friends' and foster family's birthday parties, and played T-ball at the park district. There is no evidence that respondent will ever fully address her mental health and substance abuse problems or provide a stable living environment for R.J. Although respondent

expressed a preference to raise R.J. in a religious home, and the foster parents did not indicate a religious affiliation, this is just one factor for the court to consider. In weighing all the factors, we cannot say the trial court's decision to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43          For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 44          Affirmed.